UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FORD MOTOR CREDIT COMPANY d/b/a )<br>PRIMUS FINANCIAL SERVICES and )<br>AMERICAN SUZUKI AUTOMOTIVE )<br>CREDIT, )<br> )<br>　　　　　Plaintiff, )<br> )<br>v.　　　　　 )<br> )<br>GREAT ATLANTIC INTERNATIONAL, )<br>INC. and CAR CENTER USA, INC., )<br> )<br>　　　　　Defendants. )<br> ) | C. A. No. 03-12556 WGY |

## ANSWER, COUNTERCLAIM AND JURY DEMAND

Defendants Great Atlantic International, Inc. ("Great Atlantic") and Car Center USA, Inc.

("Car Center") (collectively "Defendants"), answer the individually numbered paragraphs of

plaintiff's complaint as follows:

　　　　1.　　　Defendants admit that the plaintiff conducts business in Braintree, Massachusetts

under the name PRIMUS Financial Services, but are without knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations contained in

paragraph 1 of the Complaint.

　　　　2.　　　Admitted.

　　　　3.　　　Defendants admit that Car Center USA, Inc. is a Massachusetts corporation.

Defendants deny the remaining allegations contained in this paragraph.

　　　　4.　　　Defendants are without knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in paragraph 4 of the Complaint.

　　　　5.　　　Defendants state that the allegations contained in paragraph 5 of the Complaint

state a conclusion of law to which no response is necessary.

**COUNT I**

6.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 6 of the Complaint.

7.    Defendants admit that on or about March 26 2002, Great Atlantic signed a document entitled "Automotive Wholesale Plan Application For Wholesale Financing And Security Agreement." Defendants admit that a copy of a document entitled "Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement" is attached as Exhibit A. Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 7 of the Complaint.

8.    Denied

9.    Admitted.

10.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 10 of the Complaint.

11.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 11 of the Complaint.

12.    The document described in paragraph 12 speaks for itself and any attempt to excerpt from the document, summarize its contents, or characterize it is incomplete and misleading and is therefore denied.

13.    Defendants admit that Ford Credit sent a letter on December 10, 2003 and that a copy of the letter is attached to the Complaint as Exhibit D. Defendants state that the document attached as Exhibit D speaks for itself and any attempt to excerpt from the document, summarize its contents, or characterize it is incomplete and misleading and is therefore denied. Defendants deny the remaining allegations contained in this paragraph.

2

14.    Defendants state that the document described in paragraph 14 speaks for itself and any attempt to excerpt from the document, summarize its contents, or characterize it is incomplete and misleading and is therefore denied.

15.    Denied.

16.    Denied.

17.    Denied.

18.    Defendants are unable to admit or deny the allegations contained in paragraph 18 of the Complaint because the allegations are not susceptible to a response.

19.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the first part of the sentence contained in paragraph 19 of the Complaint, but as to the Plaintiff seeking to enforce its rights under an agreement, Defendants state that the document referred to in paragraph 19 speaks for itself and any attempt to characterize it is incomplete and misleading and is therefore denied.

## **COUNT II**

20.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 20 of the Complaint.

21.    Denied.

22.    Denied.

23.    Denied.

24.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 24 of the Complaint.

25.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 25 of the Complaint.

26.    The document described in paragraph 26 speaks for itself and any attempt to

3

excerpt from the document, summarize its contents, or characterize it is incomplete and misleading and is therefore denied.

27.    Defendants admit that Ford Credit sent a letter on December 10, 2003 and that a copy of the letter is attached to the Complaint as Exhibit D. Defendants state that the document attached as Exhibit D speaks for itself and any attempt to excerpt from the document, summarize its contents, or characterize it is incomplete and misleading and is therefore denied. Defendants deny the remaining allegations contained in this paragraph.

28.    The document described in paragraph 28 speaks for itself and any attempt to excerpt from the document, summarize its contents, or characterize it is incomplete and misleading and is therefore denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Defendants are unable to admit or deny the allegations contained in paragraph 32 of the Complaint because the allegations are not susceptible to a response.

33.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the first part of the sentence contained in paragraph 33 of the Complaint, but as to the Plaintiff seeking to enforce its rights under an agreement, Defendants state that the document referred to in paragraph 33 speaks for itself and any attempt to characterize it is incomplete and misleading and is therefore denied.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Plaintiff is barred from recovery by the doctrines of waiver and/or estoppel.

4

## THIRD AFFIRMATIVE DEFENSE

The Plaintiff is barred from recovery because the purported agreements with Defendants are null and void.

## FOURTH AFFIRMATIVE DEFENSE

The Plaintiff is barred from recovery under the terms of the agreement with the Defendants.

## FIFTH AFFIRMATIVE DEFENSE

The Plaintiff is barred from recovery because at all times the Defendants acted in good faith and without an improper purpose.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Plaintiff has failed to fulfill conditions precedent to recovery.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the Plaintiff's fraud.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by accord and satisfaction.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's requests for equitable relief are barred by the doctrine of unclean hands.

## TENTH AFFIRMATIVE DEFENSE

The Defendants state that the Plaintiff brings this action for an improper purpose.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are estopped and otherwise barred by laches.

## TWELFTH AFFIRMATIVE DEFENSE

The Defendants state that the Plaintiff breached the provisions of any contracts with the Defendants and is therefore barred from recovery.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff is barred from recovery by the Statue of Frauds.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate its damages, if any.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are wholly insubstantial, frivolous, and/or not advanced in good faith. M.G.L. c. 231§6(f).

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff has waived or released its claim and thus cannot recover.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Plaintiff's own conduct prevented Defendants from accomplishing certain of the performances contemplated by the parties' agreements.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The Defendants reserve the right to raise additional affirmative defenses.

## COUNTERCLAIM AND JURY DEMAND

Great Atlantic International Inc. and Car Center USA Inc. (collectively the "Counterclaim Plaintiffs") bring this counterclaim against Ford Motor Credit Company for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, engaging in an intentional pattern of unfair and or deceptive conduct in violation of Mass. Gen. Laws c. 93A § 11 and declaratory judgment.

## PARTIES

1.     Counterclaim-plaintiff Great Atlantic International Inc. d/b/a/ Foreign Cars North ("Foreign Cars North") is a Massachusetts corporation with its principal place of business at 514-516 Lynnway, Lynn, Massachusetts.

2.     Counterclaim-plaintiff Car Center USA Inc. ("Car Center") is a Massachusetts Corporation with its principal place of business at 540 Lynnway, Lynn, Massachusetts.

3.     Nader Jamali Affoussi, a/k/a John Jamali ("Mr. Jamali") is the President of Great Atlantic International Inc. and Car Center USA Inc.

4.     Counterclaim-defendant Ford Motor Credit Company is a Delaware Corporation with a place of business in Braintree, Massachusetts, conducting business at that location as Primus Financial Services ("Primus").

## BACKGROUND

5.     Car Center is in the business of selling new Suzuki and used motor vehicles. Foreign Cars North in the business of selling high-end used motor vehicles.  Car Center and Foreign Cars North are independent legal entities.

6.     Primus is in the business of providing financing for motor vehicle dealerships, including financing for both new and used motor vehicles.

### The Parties' Relationship

7.     Mr. Jamali has worked in the automotive sales industry for over fifteen years. Starting in 2000, Mr. Jamali, through Foreign Cars North, began doing business with Primus' retail loan division.  In the course of the relationship, Mr. Jamali dealt with John Carolan, presently the New England Regional Manager for Primus.

8.     On or about October, 2001, Car Center sought floorplan financing for its new Suzuki and used vehicles from Primus.  The parties entered into an Automotive Wholesale Plan

7

Application for Wholesale Financing and Security Agreement which together with the Automotive Finance Plan for Dealers formed the parties agreement with respect to floorplan financing (together the "Car Center Agreements").

9.     The Car Center Agreements provided that all Advances made under the floorplan financing arrangement would constitute a single obligation for Car Center which would be payable: a) as to used cars no more than 180 days from the date of funding, and b) as to new cars no more than 24 months from the date of funding.

10.     On or about December 2001, Mr. Jamali was offered the opportunity to purchase a piece of real estate located at 540 Lynnway, Lynn, Massachusetts (the "Property"). Mr. Jamali sought to purchase the property to relocate the Foreign Cars North dealership to the Property.

11.     Mr. Jamali approached Sovereign Bank to obtain a mortgage for the Property. Sovereign Bank indicated to Mr. Jamali that it would provide financing for the Property if Mr. Jamali would also transfer to Sovereign Bank the floorplan financing for the Car Center.

12.     In an effort to facilitate financing for the Property, Mr. Jamali informed Primus that Car Center intended to seek floorplan financing from Sovereign Bank, and that it would be closing the floorplan account with Primus.

13.     Primus, however, wished to retain its floorplan financing with Car Center and, in addition, gain the floorplan financing for the Foreign Cars North dealership. Upon information and belief, these accounts would assist the Braintree Primus office in meeting its sales quotas.

14.     Consequently, Primus offered to finance the Property if the Car Center floorplan account was not closed and if Primus could also provide floorplan financing for Foreign Cars North's purchase of used motor vehicles.

15.     At the time that Primus courted Foreign Cars North and Mr. Jamali to do business

8

with Primus, Primus was aware that Mr. Jamali would be undertaking a new and vastly larger business with Foreign Cars North and that Foreign Cars North would need time to put into place the facilities, systems and programs necessary to efficiently run the business and produce full financial statements. Primus was aware that Mr. Jamali would be investing a lot of money to refurbish the Property and to turn a relatively small operation into a very large operation.

16.    Primus knew at this time that Foreign Cars North and Car Center were family businesses with rudimentary accounting controls and without the systems necessary to compile individual and full financial statements for each entity. Primus was aware that the Counterclaim Plaintiffs had no expectation of being able to produce individual full financial statements or electronically maintain its records for six months to a year. Primus made no demand that the Counterclaim Plaintiffs be able to produce full independent financial statements within any particular amount of time.

17.    After a full financial due diligence review and with a thorough understanding of the Counterclaim Plaintiff's rudimentary accounting and record keeping systems, Primus, through John Carolan, committed to working with Foreign Cars North to achieve a successful relationship and promised to obtain for Foreign Cars North the amount of financing it needed. Moreover, because Primus was aware that it would take the Counterclaim Plaintiffs some time to get its systems up and running, Primus agreed to accept handwritten financing statements.

18.    Upon information and belief, Primus aggressively pursued Foreign Cars North, entered into the lending relationship with Foreign Cars North and waived its usual financial recordkeeping requirements with respect to the Counterclaim Plaintiffs in order to meet its own internal wholesale floorplan account objectives.

19.    On or about March 2002, relying on Primus' representations to provide the above

9

financing to Foreign Cars North, Mr. Jamali entered into agreements with Primus whereby Primus would provide a mortgage on the Property and motor vehicle floorplan financing for Foreign Cars North.

20.    Mr. Jamali requested a $5,000,000 floorplan credit line for Foreign Cars North as he believed that this amount was necessary to run a successful motor vehicle operation from the Property. Despite its previous assurances, Primus only granted Mr. Jamali a floorplan line of credit of $2,500,000 or sufficient credit to meet a forty-five (45) day rate of travel. However, Primus assured Mr. Jamali that the credit line would be increased to meet the needs of the dealership. The difference between the $5 million and $2.5 million in borrowing ability represented a significant decrease in Foreign Cars North's ability to make a profit.

21.    On March of 2002, relying on Primus' promises and representation, Mr. Jamali, on behalf of Foreign Cars North, entered into a Automotive Wholesale Plan Application for Wholesale Plan Financing and Security Agreement which together with the Automotive Finance Plan for Dealers formed the parties' agreement with respect to floorplan financing for Foreign Cars North (together the "Foreign Cars North Agreements").

22.    The Foreign Cars North Agreements provided that all Advances made under the floorplan financing arrangement would constitute a single obligation for Foreign Cars North which would be payable no more than 180 days from the date of funding for used cars.

23.    At the beginning of the relationship between Foreign Cars North and Primus, Primus made good on its promise to increase Foreign Cars North's borrowing ability beyond the $2.5 million pledged. John Carolan used his discretion to increase Foreign Car North's borrowing to approximately $3.1 million.

24.    At the inception of the relationship Primus also agreed to and did extend the

amount of time that used vehicles could remain on floorplan financing from six months to nine months.

25.    In order to improve its ability to produce financial reports and to bolster the record keeping efficiency of the business, the Counterclaim Plaintiffs entered into a contract with Automated Data Processing, Inc. ("ADP"). ADP installed its systems for the Counterclaim Plaintiffs on or about September of 2002 and started training on the system. The Counterclaim Plaintiffs did not have the ability to electronically track cars or manage data until early 2003.

26.    In the first few months of the Foreign Cars North Agreements, Foreign Cars North worked to acquaint itself with Primus' reporting requirements while upgrading its reporting systems.

### Primus acts in bad faith and contrary to the parties' Agreements

27.    Upon information and belief, in the summer of 2002, approximately four months after Primus entered into the Foreign Cars North Agreements, Primus resolved that it would no longer do business with the Counterclaim Plaintiffs and began a pattern of conduct designed to force the Counterclaim Plaintiffs to terminate their relationship with Primus. Primus materially changed the terms under which it would continue to do business with the Counterclaim Plaintiffs, harassed the Counterclaim Plaintiffs and interfered with the Counterclaim Plaintiffs' ability to carry on their business.

28.    On or about September 2002, only six months after the Foreign Cars North Agreements were executed, Primus began sending Foreign Cars North notices that it intended to terminate its business relationship with Foreign Cars North.

29.    These notices provided pretextual reasons for termination. Despite the letters, Primus continued to provide floorplan financing for Foreign Cars North. In addition, Primus expressly represented to the Counterclaim Plaintiffs that despite the letters the financing

11

relationship would not be terminated.

30.    Shortly after execution of the Foreign Cars North Agreements, Primus began to materially alter the terms of the parties' performance under their agreements in breach of both the Foreign Cars North Agreements and the Car Center Agreements. Primus used the difficulties that the Counterclaim Plaintiffs encountered while they integrated the new ADP systems into their business as a pretext for the changes.

31.    Without justification, Primus restricted Foreign Cars North's borrowing ability under the floorplan financing to $2.5 million and cut Foreign Car North's rate of travel from 45 days to 30 days. Primus also limited the floorplan financing for used vehicles from nine months to six months.

32.    Primus accelerated the frequency of wholesale audits to be performed on the Counterclaim Plaintiffs to weekly audits. Primus continues to perform weekly audits despite the fact that these have been at a higher than acceptable level for over a year.

33.    In addition to the increased frequency of the audits, Primus demanded that it hold title for all of the cars it financed at Foreign Cars North.

34.    Without basis, Primus required the Counterclaim Plaintiffs to submit independent monthly financial statements for all of its dealership corporations.

35.    Without justification, Primus changed the payoff schedule following the sale of a used car for Foreign Cars North from five (5) days to forty-eight (48) hours. Primus also increased the interest rate for the Counterclaim Plaintiffs' floorplan financing.

36.    Throughout this period to the present, the Counterclaim Plaintiffs met all of their financial obligations to Primus under the Foreign Cars North Agreements, the Car Center Agreements and the mortgage for the Property.

37.     While threatening to terminate its financing relationship with Foreign Cars North and decreasing Foreign Car North's borrowing ability, Primus also put pressure on Foreign Cars North to terminate its financing arrangements with third parties claiming that these were a violation of Foreign Cars North's obligations.

38.     In response to the termination letters and the significant changes in Primus' performance under the Foreign Cars North Agreements, Mr. Jamali began to search for different floorplan financing for the Counterclaim Plaintiffs.

39.     Mr. Jamali approached both KeyBank and Citizens Bank to try to obtain different financing.

40.     Upon information and belief, Primus had contact with both KeyBank and Citizens to discuss its reasons for wanting to terminate Foreign Cars North's financing. Moreover, Primus' onerous and heavy handed lending practices described above have been made known to Key Bank and Citizens and other members of the lending community providing strong disincentives to outside lenders to entering into agreements with the Counterclaim Plaintiffs.

41.     Both KeyBank and Citizens denied the Counterclaim Plaintiffs floorplan financing.

42.     The Counterclaim Plaintiffs have been unable, to date, to secure alternate floorplan financing.

43.     In an attempt to relieve the cash flow decrease created by Primus' arbitrary and capricious decreases in financing, Foreign Cars North attempted to obtain Primus' consent to borrow against the equity in its Property. Primus unreasonably withheld its consent.

44.     As a result of Primus actions, including but not limited to its placement of a series of increasingly onerous lending restrictions and its constant threat of termination, Mr. Jamali had

to devote significant amounts of time over the past year to handling Primus' continually increasing demands, and has been unable to develop a long term business plan or strategy for maintaining and growing the business..

45.     Primus has continued to place onerous burdens on the Counterclaim Plaintiffs which are not provided for under either the Foreign Cars North Agreements or the Car Center Agreements, including weekly wholesale audits, increased interest rates, accelerated payment schedules and a constant threat of termination.

## Primus makes demand without an event of default.

46.     In the summer of 2003, Primus continued its crusade to force the Counterclaim Plaintiffs to sever their relationship with Primus by demanding that the Counterclaim Plaintiffs sign a Forbearance Agreement. The proposed Forbearance Agreement granted the Counterclaim Plaintiffs until October 31, 2003 to retire all of their outstanding obligations with Primus and forced the Counterclaim Plaintiffs to relinquish all of its rights under the Foreign Cars North Agreements and the Car Center Agreements. The Counterclaim Plaintiffs refused to sign the Forbearance Agreement.

47.     On or about December 10, 2003, Primus made demand for payment in full for all advances under both the Foreign Cars North Agreements and the Car Center Agreements, which demand totaled $3,162,357. Primus did not assert that Foreign Cars North or Car Center were in default under these agreements.

48.     Both the Foreign Cars North Agreements and the Car Center Agreements list specific Events of Default. *See* Complaint, Exhibits A and E, ¶ 9.

49.     At the time demand was made, Primus was aware that the Counterclaim Plaintiffs were not in default under either the Foreign Cars North Agreements or the Car Center Agreements and that there existed no risk of impaired performance or non-payment. In fact,

14

Primus' own internal notes, authored by John Carolan, state that as of October 13, 2003, the Counterclaim Plaintiffs' "current, weekly audits are good, financial statements are on time and report profitability. There are no matured units over six months" and that the "real estate mortgage continues to be current." See October 13, 2003 email from John Carolan, attached hereto as Exhibit 1.

### Primus' actions are in breach of the parties' agreements and in bad faith

50.     On or about December 19, 2003, Primus filed the instant action stating that, pursuant to the Car Center Agreements and the Foreign Cars North Agreements, Primus has the right to receive full payment of all amounts owed by the Counterclaim Plaintiffs to Primus upon demand.

51.     Primus also sought, among other remedies, a preliminary injunction ordering repossession of all of the Counterclaim Plaintiffs' vehicles.

52.     Upon information and belief, at the time Primus filed its action it knew that the Car Center Agreements and the Foreign Cars North Agreements were not demand instruments and did not entitle it to repossession without default.

53.     In its Verified Complaint Primus alleged that it believed that the Counterclaim Plaintiffs' vehicles are "in immediate danger of misuse, misappropriation or conversion and that its interest is in immediate jeopardy." Primus also stated that without immediate possession of the vehicles "it is highly probable that it will incur substantial loss through depreciation and other damage to its interest."

54.     Despite its claim that its interest are in immediate jeopardy, Primus has continued to extend floorplan financing to the Counterclaim Plaintiffs on a regular basis. For example, as late as January 22, 2004, Primus approved approximately $39,000 worth of floorplan financing.

55.     Upon information and belief, at the time Primus filed its Verified Complaint, it

15

was aware that it faced no risk of non-payment from the Counterclaim Plaintiffs or other risk of irreparable injury. In fact, as of December 18, 2003, in the course of its review of the Counterclaim Plaintiffs' wholesale lines, Primus approved its continued relationship with the Counterclaim Plaintiffs through the next review date of June of 2004.

56.    In its Verified Complaint, Primus stated that it had terminated its financing relationship with the Counterclaim Plaintiffs. Upon information and belief, at the time Primus made this statement it knew it to be untrue. Primus states in its review of the wholesale relationship with the Counterclaim Plaintiffs that it had not yet terminated the financing relationship. Moreover, Primus continued to extend floorplan financing to the Counterclaim Plaintiffs as late as January 22, 2004.

57.    Primus does not have a risk of irreparably injury as it presently holds a security interest in all of the Counterclaim Plaintiffs' vehicles and holds title to all the vehicles for which it provides floorplan financing. Finally, Primus holds, since the inception of the floorplan financing, a security interest the Property located at 540 Lynnway, Lynn, Massachusetts in which Great Atlantic has significant equity, and in all of the other assets of the Counterclaim Plaintiffs.

## COUNT I
### (Breach of Foreign Cars North Agreements)

58.    The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

59.    Primus violated its obligations under the Foreign Cars North Agreements by, among other things, making demand for accelerated payment and seeking repossession of the vehicles without a default.

60.    Primus violated its obligations under the Foreign Cars North Agreements by, among other things, materially altering the terms under which it would continue to do business

16

with Foreign Cars North including, without limitation: changing the frequency of wholesale audits, requiring that Foreign Cars North surrender title to all used vehicles under floorplan financing to Primus, accelerating the due date for payoffs, lowering the rate of travel, and requiring monthly financial statements.

61.    Primus violated its obligations under the Foreign Cars North Agreements by, among other things, arbitrarily and unreasonably decreasing Foreign Cars North's borrowing limits.

62.    Primus violated its obligations under the Foreign Car North Agreements by demanding full payment of Foreign Car North's obligations under its floorplan financing.

63.    Primus had violated its obligation under the Foreign Cars North Agreements by terminating the agreements without cause.

64.    As a result of Primus' violation of the parties' Agreements, Foreign Cars North has suffered and continues to suffer monetary damage.

## COUNT II
### (Breach of Car Center Agreements)

65.    The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

66.    Primus violated its obligations under the Car Center Agreements by, among other things, making demand for payment and seeking repossession of the vehicles without a default.

67.    Primus violated its obligations under the Car Center Agreements by, among other things, materially altering the terms under which it would continue to do business with Car Center including, without limitation: changing the frequency of wholesale audits, requiring that Car Center surrender title to all used vehicles under floorplan financing to Primus, accelerating the due date for payoffs, lowering the rate of travel, and requiring monthly financial statements.

17

68.     Primus violated its obligations under the Car Center Agreements by demanding full payment of Car Center's obligations under its floorplan financing.

69.     Primus breached the Car Center Agreements by terminating these agreements without cause.

70.     As a result of Primus' violation of the parties' Agreements, Car Center has suffered and continues to suffer monetary damage.

## COUNT III
**(Breach of covenant of good faith and fair dealing in Foreign Cars North Agreements)**

71.     The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

72.     The Foreign Cars North Agreements contain implied covenants of good faith and fair dealing.

73.     Primus breached the covenants of good faith and fair dealing in these agreements by, among other things, making onerous demands on Foreign Cars North which are not required of other dealers, seeking rights and remedies outside the provision of the Foreign Cars North Agreements, demanding full payment under the agreements without default, giving pretexual reasons to purportedly justify its termination notices, and alleging economic harm that is not likely to occur.

74.     As a result of Primus' actions, Foreign Cars North has suffered and continues to suffer monetary damages.

## COUNT IV
**(Breach of covenant of good faith and fair dealing in Car Center Agreements)**

75.     The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

18

76.     The Car Center Agreements contain implied covenants of good faith and fair dealing.

77.     Primus breached the covenants of good faith and fair dealing in these agreements by, among other things, making onerous demands on Car Center which are not required of other dealers, seeking rights and remedies outside the provision of the Agreements, demanding full payment under the agreements without default, giving pretexual reasons to purportedly justify its termination notices, and alleging economic harm that is not likely to occur.

78.     As a result of Primus' actions, Car Center has suffered and continues to suffer monetary damages.

**COUNT V**
**(Promissory estoppel)**

79.     The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

80.     In order to induce the Counterclaim Plaintiffs to enter into a financing relationship with Primus, Primus represented to the Counterclaim Plaintiffs that it would provide Great Atlantic's with the floorplan financing necessary to run a successful business.

81.     In order to induce the Counterclaim Plaintiffs to enter into a financing relationship with Primus, Primus represented to the Counterclaim Plaintiffs that it would work with the Counterclaim Plaintiffs through the upgrade of their financial reporting systems.

82.     Primus made these representations in order to induce the Counterclaim Plaintiffs to continue their business relationship with Primus, and made such representation with the intent that the Counterclaim Plaintiffs rely on them, and the Counterclaim Plaintiffs reasonably relied thereon to their detriment.

83.     As a result of Primus' representation, it is estopped from denying its promise and

19

representations to the Counterclaim Plaintiffs.

84.    As a result of Primus' actions, the Counterclaim Plaintiffs have suffered and continue to suffer monetary damages.

## COUNT VI
### (Promissory estoppel)

85.    The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

86.    Primus represented to the Counterclaim Plaintiffs that notwithstanding the termination letters, it would continue doing business with the Counterclaim Plaintiffs.

87.    Primus made the representation in order to induce the Counterclaim Plaintiffs to continue their business relationship with Primus and made such representation with the intent that the Counterclaim Plaintiffs rely on them, and the Counterclaim Plaintiffs reasonably relied thereon to their detriment.

88.    As a result of Primus' representation, its is estopped from denying its promise and representations to the Counterclaim Plaintiffs.

89.    As a result of Primus' actions, the Counterclaim Plaintiffs have suffered and continue to suffer monetary damages.

## COUNT VII
### (Violation of c. 93A)

90.    The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

91.    At all times relevant hereto, Foreign Cars North was engaged in the conduct of trade or commerce within the meaning of M.G.L. c. 93A.

92.    At all times relevant hereto, Car Center was engaged in the conduct of trade or

commerce within the meaning of M.G.L. c. 93A.

93.     At all times relevant hereto, Primus was engaged in the conduct of trade or commerce within the meaning of M.G.L. c. 93A.

94.     The actions of Primus, as alleged above and including the filing of this lawsuit and the request for a preliminary injunction, constitute unfair and knowingly deceptive practices prohibited by M.G.L. c. 93A.

95.     The actions of Primus as alleged above, were performed willfully or knowingly.

96.     As a direct result of Primus' violation of M.G.L. c. 93A, the Counterclaim Plaintiffs have suffered and continue to suffer monetary damage.

### COUNT VIII
### (Request for Declaratory Judgment)

97.     The Counterclaim Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

98.     There exists and actual controversy between the Counterclaim Plaintiffs and Primus regarding whether the Foreign Cars North Agreements and the Car Center Agreements constitute demand instruments conveying upon Primus the unfettered discretion to demand, without default, all amounts owed by the Counterclaim Plaintiffs to Primus under its financing relationship.

99.     This Court should declare that the Foreign Cars North Agreements and the Car Center Agreements are not demand instruments and that the Counterclaim Plaintiffs are in compliance with the monetary and non-monetary requirements of the agreements.

WHEREFORE, Great Atlantic International Inc. and Car Center USA Inc., request that this Court enter judgment as follows:

1.    Dismissing the Complaint and each and every count thereof with prejudice;

2.    Awarding Great Atlantic International Inc. and Car Center USA Inc. its damages on all counts of their Counterclaim in an amount to be proven at trial;

3.    Awarding Great Atlantic International Inc. and Car Center USA Inc. their reasonable attorney's fees and costs;

4.    Awarding Great Atlantic International Inc. and Car Center USA Inc. treble damages pursuant to count VII of their Counterclaim;

5.    Declaring Ford Motor Company's Application for Wholesale Financing and Security Agreement is not a demand instrument and that Great Atlantic is in compliance with all requirements of the agreements;

6.    Awarding Great Atlantic International Inc. and Car Center USA Inc. such other and further relief as the Court finds just and equitable.

**GREAT ATLANTIC INTERNATIONAL INC. AND CAR CENTER USA, INC.
DEMAND A TRIAL BY JURY.**

GREAT ATLANTIC INTERNATIONAL, INC.
and CAR CENTER USA, INC.
By its attorneys,

Paul M. Harris, BBO # 223500
Daniel J. Kelly, BBO # 553926
M. Carolina Avellaneda, BBO # 566740
Kristin M. Cataldo, BBO #654033
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  02110
(617) 345-7000

Dated:  January 26, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Answer, Counterclaim and Jury Demand was served upon the attorney of record for each party by mail/by hand/electronically this 26 day of January, 2004.

M. Carolina Avellaneda

23

**Carolan, John V. (J.V.)**

| | |
|---|---|
| **From:** | Carolan, John V. (J.V.) |
| **Sent:** | Monday, October 13, 2003 8:58 AM |
| **To:** | Howard, Mike (M.C.) |
| **Cc:** | McMahon, Joseph (J.C.); Furness Jr., Gerald (G.W.); Hillenburg, David (D.A.); Lozzio, Jennifer (J.L.); Quintal, Leonard (L.F.) |
| **Subject:** | FW: Forebearance Agreement Great Atlantic International |

Mike;

When you return we need to get together with Ann Lee and discuss this issue and the next step in this process. See the attached email from legal.

I also recently spoke with Kevin Collins the dealership CPA from O'Connor and Drew. He confirmed that the dealership is aggressively pursing a floor plan relationship with Key Bank. He stated he is working with the local Key Bank representative James Moretti on financial statement questions. Mr. Collins states he feels the chance of approval is fair to good based on the dealership equity in vehicles, year to date profitability and real estate equity position. I have been consistently told that we would have a commitment letter from Key by October month end.

The issue regarding the corporate structure has also been resolved. The CPA firm did set up another company named Car Center USA Group, Inc. to eventually eliminate the current structure of four separate corporations. The CPA and dealer has been advised that PRIMUS does not have a floor plan relation with this new entity and the dealer has been advised not eliminate the three companies until a new finance source is obtained. We continue to receive one consolidate financial statement for the three used car entities and one Suzuki factory statement for the new point. Mr. Collins states the dealer keeps three separate schedules and the year end will have three separate Federal Tax Returns. There will also be a year end tax return for the Suzuki dealership.

According to the attached recommendation from Legal, if we place the lines on hold the next step will probably be court. That, however, may be the only choice at this point if the Key Bank commitment does not materialize.

All payments are current, weekly audits are good, financial statements are on time and report profitability. There are no matured units over six months. The real estate mortgage continues to be current. Regardless of the past violations Ann Lee states this will work against us in court. However, we have the right to terminate the relationship and a judge may have to set the deadline.

I continue to monitor this issue daily and will continue to report via monthly Watch Reports. I will also continue to advise on interim developments.

John V. Carolan
Boston Manager
Ford Financial
PRIMUS Boston Branch
Phone # 781-849-5373
Fax # 781-849-5360
jcarolan@ford.com

-----Original Message-----

| | |
|---|---|
| **From:** | Carolan, John V. (J.V.) |
| **Sent:** | Tuesday, October 07, 2003 2:47 PM |
| **To:** | Lee, Ann (O.) |

GADSBY HANNAH LLP

M. Carolina Avellaneda
cavellaneda@ghlaw.com

Tel: 617 345 7065
Fax: 617 204 8065

January 26, 2004

VIA HAND DELIVERY

Civil Court Clerk's Office
United States District Court
One Courthouse Way
Boston, MA 02110

225 Franklin Street
Boston MA 02110

Tel  617 345 7000
Fax 617 345 7050

www.ghlaw.com

Re:    Ford Motor Credit Company, et al. v. Great Atlantic International, Inc., et al.
       U.S.D.C. Massachusetts C.A. No. 03-12556 WGY

Dear Sir or Madam:

Enclosed for filing and docketing in the above-referenced matter please find the following documents:

1.    Answer, Counterclaim and Jury Demand
2.    Corporate Disclosure Statement of Great Atlantic International, Inc.
3.    Corporate Disclosure Statement of Car Center USA, Inc.

Thank you for your attention to this matter.

Sincerely,

M. Carolina Avellaneda

CMA/eel
Enclosures

cc:    Daniel J. Kelly, Esq.
       Paul M. Harris, Esq.
       Kristin M. Cataldo, Esq.
       Michael E. Hager, Esq.

B0347696v1